**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **CIVIL ACTION** |
| | : | |
| **BRIAN J. NIXON,** | : | **No. 09-417** |
| Debtor. | : | **BANKRUPTCY APPEAL** |

<u>**MEMORANDUM**</u>

Schiller, J.                                                                                          June 25, 2009

      Michael T. Foster appeals from the decision of the Bankruptcy Court on Debtor Brian J.

Nixon's objection to Foster's proof of claim.  Foster believes that the Bankruptcy Court erred when

it placed the burden of proof on him, disallowed a portion of one of his attorney's claim for fees, and

tolled the running of interest on his claim.  Appellant asks this Court to overturn the Bankruptcy

Court's decision and thereby approve his claim in full.  After a review of the record and a full and

complete hearing on Foster's appeal, this Court finds no error below.   This Court therefore affirms

the decision of the Bankruptcy Court and dismisses Foster's appeal.

# I.   BACKGROUND

## A.   The Bankruptcy

      On or about December 27, 1994, Debtor obtained a business loan from the Quakertown

National Bank (the "Bank") for $215,000.  Debtor executed a Promissory Note, a Business Loan

Agreement, and a Mortgage on his property in Coopersburg, Pennsylvania.  The Mortgage contained

the following clause about attorneys' fees:

> If Lender institutes any suit or action to enforce any of the terms of this Mortgage,
> Lender shall be entitled to recover such sum as the court may adjudge reasonable as
> attorneys' fees at trial and upon any appeal . . . Expenses covered by this paragraph
> include, without limitation, however subject to any limits under applicable law,
> Lender's attorneys' fees and Lender's legal expenses, whether or not there is a

lawsuit, including attorneys' fees and expenses for bankruptcy proceedings . . .

(R. at Ex. 6 [Mortgage].)  The Mortgage provided that, to the extent it was not preempted by federal law, Pennsylvania law governed, without regard to its conflicts of law provisions.  (*Id*.)  The Promissory Note stated:

> Lender may hire or pay someone else to help collect this Note if Borrower does not pay.  Borrower will pay Lender that amount.  This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings . . . and appeals."

(R. at Ex. 5 [Promissory Note].)  The Promissory Note was also "governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions."  (*Id*.)  The Business Loan Agreement included a similar covenant regarding attorneys' fees and was also governed by Pennsylvania law. (R. at Ex. 7 [Business Loan Agreement].)

On June 7, 2007, the Bank filed a confession of judgment for $247,067.26 in the Court of Common Pleas of Lehigh County.  This judgment attached as a lien to Debtor's real property, including land he owned on Gerryville Pike in Bucks County.  The Bank subsequently executed a document titled "Assignment of Mortgage, Note, Assignment of Rents and Judgment" in favor of Foster.  The Mortgage, Assignment of Rents and the Judgment are all expressly referenced in this assignment.  The Business Loan Agreement is not mentioned in the assignment and reference to the Note is found only in the title of the assignment.[1]

---

[1] The Bankruptcy Court concluded that the "subject matter of the Assignment is sufficiently identified as encompassing all the rights related to the Indebtedness, including rights under the Note and Business Loan Agreement."  *In re Nixon*, 400 B.R. 27, 34 (Bankr. E.D. Pa. 2008).

Debtor filed a voluntary Chapter 13 bankruptcy petition on October 22, 2007.  Foster immediately filed a motion for relief from stay with respect to the Coopersburg property.  During the hearing on the motion, Debtor claimed that he had a buyer for the Gerryville Pike property, which would allow him to pay Foster's claim in full.  Accordingly, the relief from stay motion was denied but Debtor was required to remit to Foster any rental income from the Coopersburg Property.  The sale of the Gerryville Pike property was approved on January 3, 2008, and, as a result, $360,664.37 was distributed to the Chapter 13 Trustee.  On October 10, 2008, Debtor filed a Second Amended Plan, which provided for full payment of Foster's allowed secured claim.  Foster objected to this plan because it failed to specify that payment would be made when the Gerryville Pike property sale proceeds were received.

Foster filed an Amended Proof of Claim in the amount of $322,471.85, which, according to the Chapter 13 Trustee, needed to be liquidated before the Bankruptcy Court could determine the feasibility of the Second Amended Plan.  "Notably the Foster Claim evidences a significant increase from the Judgment amount which is attributed to the post-judgment accumulation of interest and late charges ($49,097.75) and attorneys fees and costs ($26,306.84)."  *Foster*, 400 B.R. at 31.  Debtor objected to Foster's Amended Proof of Claim.  Relevant to this appeal, Debtor's objection focused on what he deemed excessive and unreasonable counsel fees and excessive and unspecified interest.  The Court held a hearing on Debtor's objection on September 11, 2008.

### B.    Bankruptcy Court Opinion[2]

Three attorneys represented Foster throughout the course of the Chapter 13 petition.  Marc Kranson, who first entered an appearance on behalf of Foster, worked on the matter for a total of

---

[2] The Court focuses only on those portions of the opinion relevant to Foster's appeal.

3

12.3 hours at an hourly rate of $185, plus costs of $150, for a total of $2,425.50.  In October of 2008, Kranson withdrew and was replaced by Michael Kaliner.  Kaliner handled the defense to the objection and authored memoranda of law; Foster paid Kaliner a $1500 retainer.  Neither Kranson nor Kaliner's fees are before this Court.  The third attorney, Ronald Clever, who never entered an appearance on Foster's behalf in the bankruptcy case, billed 106 hours at an hourly rate of $275, for a total of $29,190 in fees and costs for services rendered between September of 2007 and September of 2008.  Clever did not sign any of the motions or pleadings submitted on Foster's behalf.

According to the Bankruptcy Court, "not much [ ] happened between the settlement of the Stay Motion and the objection hearing." *Id*.  The case was monitored and various status hearings were held; "Clever appeared at most (if not all) of the hearings to object to whatever was contemplated or happening." *Id*.  Turning to the recoverability of attorneys' fees, the Bankruptcy Court noted that the Bankruptcy Code permits an oversecured creditor – which Foster undisputedly is – to recover reasonable attorneys' fees if the parties' contract so provides.  The Bankruptcy Court concluded that, because the Business Loan Agreement and the Mortgage expressly permitted the recovery of attorneys' fees and costs, Foster was permitted to seek reasonable fees and costs.

Foster argued that the reasonableness of the fees was irrelevant.  Because Debtor's proposed Chapter 13 plan would pay even unsecured creditors 100% of their claims, fees deemed unreasonable would, under § 506 of the Bankruptcy Code, remain as allowed unsecured claims that would be paid.  The Bankruptcy Court, however, concluded that § 506 must be read along with § 502 of the Bankruptcy Code, which confronts the threshold question of whether a claim should be allowed or disallowed.  Accordingly, the Bankruptcy Court treated Debtor's objection as a request to disallow certain components of the Foster claim under § 502, not as an objection to their secured status under

4

§ 506.  Section 502 disallows claims that are unenforceable under applicable law.  Noting that both Pennsylvania and federal law require that contractually mandated attorneys' fees be reasonable, the Bankruptcy Court concluded that any unreasonable attorneys' fees could not qualify as an allowed unsecured claim.

The Bankruptcy Court used the lodestar method to review for reasonableness Clever's attorneys' fee petition.  The Bankruptcy Court Judge relied on her experience and expertise and noted that Foster was a secured creditor, who held allowed judgment liens on Debtor's real property "valued comfortably in excess of his claim . . . [i]n short, Foster has never been in jeopardy of non-payment.  The only question has been when that would happen."  *Id*. at 38-39.

The Bankruptcy Court found that Clever's legal strategy and lack of bankruptcy knowledge needlessly prolonged the confirmation process.  "Ironically [Clever's] complaints about the protracted nature of the case only protracted the hearings more."  *Id*. at 39.  She further found his approach and the hours he billed unreasonable.  She also questioned Clever's billing credibility and decided that it was never "Clever's intention to charge Foster for these hours that he allegedly spent," because he failed to track his hours as he performed them and failed to bill Foster for his services.  *Id*.  Clever "had every incentive to use a heavy hand based on his view that Debtor would be responsible for payment."  *Id*.  Ultimately, the judge awarded Clever attorneys' fees of $4,340, a fraction of the $29,190 he sought.

Foster raises three issue in this appeal, asserting that the Bankruptcy Court: (1) incorrectly shifted to Foster the burden of proving the validity of his claim; (2) wrongly disallowed Foster's request for fees under § 502 when, under § 506, the Bankruptcy Court should have at least deemed any unreasonable fees an allowed unsecured claim; and (3) improperly tolled the running of interest.

5

## II.      STANDARD OF REVIEW

District courts have jurisdiction over appeals from final bankruptcy court orders.  28 U.S.C.

§ 158(a) (2005).  A district court reviewing a bankruptcy court's decision has plenary review over

the bankruptcy court's legal conclusions.  *See Am. Flint Glass Workers Union v. Anchor Resolution

Corp.*, 197 F.3d 76, 80 (3d Cir. 1999); *Computer Personalities Sys. v. Aspect Computer*, 320 B.R.

812, 816 (E.D. Pa. 2005).  "Findings of fact . . . shall not be set aside unless clearly erroneous, and

due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the

witnesses."  FED. R. BANKR. P. 8013; *see also In re Nelson Co.*, 959 F.2d 1260, 1263 (3d Cir. 1992)

(citing *Brown v. Pa. State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988)).  A finding of

fact is clearly erroneous if the reviewing court, upon review of the record, "is left with the definite

and firm conviction that a mistake has been committed."  *In re CellNet Data Sys., Inc.*, 327 F.3d 242,

244 (3d Cir. 2003) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Matters

left to the discretion of the bankruptcy court judge are reviewed for abuse of that discretion.  *In re

Martin's Aquarium, Inc.*, 98 F. App'x 911, 913 (3d Cir. 2004).  An abuse of discretion exists if "the

[ ] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an

improper application of law to fact."  *In re SGL Carbon Corp.*, 200 F.3d 154, 159 (3d Cir. 1999).

## III.     DISCUSSION

### A.      Burden Shifting

According to Foster, Debtor "merely recited that the interest and other claim elements were

'excessive and unspecified,'" and thereby failed to adduce evidence sufficient to shift the burden of

proof to him on the validity of his claim. (Appellant's Br. at 8.)

6

Although Debtor's response to Foster's argument discusses late fees and interest rates, Foster explicitly states that he is not appealing the decision on late fees or interest rates.  (*Id.* at 3.)  But what Foster does not appeal directly he appeals indirectly.  He argues, via footnotes, that because he is appealing the burden of proof applied by the Bankruptcy Court, should this Court agree with his position, the Debtor's objection would be denied "*in toto*, and therefore the Proof of Claim (as amended) will, *a fortiori*, be allowed in full."  (Appellant's Br. at 3 n.5 & n.6, 10 n.15, 11-12 n.16.)  Foster's brief asserts that there are no relevant facts regarding the burden of proof "because the Debtor did not offer any proof that the Claim had any charges in it which were not contractual. . . . Suffice it to say, with regard to relevant facts, there are none: the Debtor did not put any evidence into evidence, to shift the burden."  (Appellant's Br. at 4.)

Latin phrases notwithstanding, Appellant's argument is unavailing.  The contractual nature of the fees sought does not foreclose a valid objection by Debtor.  Rather, the record shows that the Bankruptcy Court identified the correct legal standard and properly applied that standard.  As the Bankruptcy Court made clear at the outset of its analysis, "Bankruptcy Rule of Procedure 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure constitutes *prima facie* evidence of the validity and amount of the claim."  *Nixon*, 400 B.R. at 33 (citations omitted).  Relying on the same Third Circuit case that Foster asserts reflects the current state of the law, the Bankruptcy Court stated that the objecting party bears the burden of producing evidence that, if believed, would refute at least one of the allegations essential to the claim's legal sufficiency.  *Id.* (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)); (Appellant's Br. at 9-10.)

Debtor objected that, although the principal balance on the line of credit was $215,000,

Foster claimed interest, late fees, and other charges of $107,471.85, adding almost 50% to the principal balance. The Bankruptcy Court held a hearing on Debtor's objection on September 11, 2008. During the hearing, before the Debtor rested his case-in-chief, Foster's lawyer interjected, "Judge, at this point in time, I'd like to make a motion, Judge. I don't think this objection satisfies the --" Before the lawyer finished his sentence, the Judge denied the motion. (Bank. Hrg. Sept. 11, 2008 at 33:19-22.) Although Foster makes much of this ruling, this Court will not speculate on the motion. This Court's review of the record demonstrates that the Bankruptcy Court was well versed in the legal standard related to proofs of claim and properly applied that standard.

After reviewing the record, this Court concludes that Appellant's contention regarding the burden of proof is baseless. The Bankruptcy Court rejected Debtor's argument that because the Bank elected not to apply the default rate, Foster was forced to charge the rate the bank charged at the time of the judgment. *Foster*, 400 B.R. at 35. Although the Bankruptcy Court determined that Foster could charge the default rate, given the Note allowed for a variable interest rate, it rejected Foster's claim that a static interest rate applied. Rather, the Bankruptcy Court concluded that "Debtor has met his initial burden of casting doubt upon Foster's claim of a static interest rate of 13.25 percent." *Id*. at 36. The burden then shifted to Foster to prove his case, which he failed to do. Similarly, the Bankruptcy Court reviewed the language of the Note in holding that late charges could not be imposed post-judgment. Before this Court, Appellant makes a bare-boned pronouncement that the Bankruptcy Court Judge wrongly shifted the burden of proof, coupled with a contention that no relevant facts pertain to this argument because the burden of proof was wrongly shifted. Contrary to these assertions, the Bankruptcy Court explicitly set forth the correct standard and applied that standard.

8

### B.    Attorneys' Fees

The Bankruptcy Court found that a significant portion of Clever's requested legal fees were unreasonable and disallowed them under 11 U.S.C. § 502.  Foster contends that his request for attorneys' fees is governed by 11 U.S.C. § 506(b), which addresses oversecured creditors, and not 11 U.S.C. § 502, which allows a bankruptcy court to disallow claims that are unenforceable under applicable law.  As Foster sees it, because the Chapter 13 plan proposed by Debtor contemplates a 100% payout to unsecured creditors, any fees deemed unreasonable under § 506 should still be paid as unsecured claims.  *See Nixon*, 400 B.R. at 37.  Foster further claims that he was blind sided by the Bankruptcy Court's reliance on § 502, which "[n]o lawyer in the case said anything about invoking." (Appellant's Br. at 11.)  Foster's brief asserts that Clever was not seeking approval of an attorneys' fee petition but rather was simply informing the Bankruptcy Court that the fees had been incurred. The question was whether a portion of the fees sought would be allowed as part of his unsecured, rather than secured, claim.  (*Id*. at 13.)

For such fees and costs to be included as part of an allowed secured claim under § 506(b), a creditor must be oversecured and the attorneys' fees sought must be: (1) provided for in an agreement under which the claim arose; (2) reasonable; and (3) permitted under applicable non-bankruptcy law.[3]  *In re Nunez*, 317 B.R. 666, 668 (Bankr. E.D. Pa.  2004); *see also In re W. Chester Realty of Haverford, Inc.*, 186 B.R. 612, 617 (Bankr. E.D. Pa. 1995).

---

[3] Section 506(b) of the Bankruptcy Code reads:

[t]o the extent that an allowed secured claim is secured by property the value of which, after recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

Before tackling the question presented by § 506(b), whether an allowed claim is secured or unsecured, the court must determine question of whether a claim is allowed. *See In re Amron Techs.*, 376 B.R. 49, 51 (Bankr. M.D. Ga. 2007) ("If the claim is disallowed, the analysis ends, and § 506 never enters the picture.").  Section 502(b)(1) provides that upon objection to a proof of claim, a court, after notice and a hearing, "shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."

In his briefing before the Bankruptcy Court on Debtor's objection, Foster cited *Welzel v. Advocate Realty Investments, LLC*, 275 F.3d 1308 (11th Cir. 2001), to support his position that fees deemed unreasonable should be allowed as an unsecured claim, rather than be disallowed under § 502.  *Welzel* considered whether a bankruptcy court was entitled to disallow, under § 506(b), that part of a valid fee agreement determined to be unreasonable as a secured claim.  275 F.3d at 1312 n.2.

Welzel was loaned over $1 million and in exchange executed promissory notes that allowed the lender to collect, in the event of default and "subject to any limits under applicable law," its "costs of collection, including . . . fifteen percent (15%) of the principal plus accrued interest as attorneys' fees."  The notes were later purchased by Advocate Realty Investments.  Shortly before the purchase, Welzel was informed that he was in default, that the notes were immediately due and payable and that, in accordance with Georgia law, the noteholder would seek attorneys' fees as permitted by the agreement.  Welzel remained in default and filed for Chapter 11.  Advocate, an oversecured creditor, filed a secured claim that included 15% tacked on as attorneys' fees in accordance with the notes.  Welzel objected to the fees as unreasonable under § 506(b).

10

The bankruptcy court concluded that the claim for attorney's fees was allowed under § 502 and thus bifurcated the attorney's fee claim into a secured portion – the reasonable fees – and an unsecured portion – the unreasonable fees.  On appeal to the district court, the court applied § 506 but held that bifurcation was inappropriate.  Instead, the district court disallowed those fees deemed unreasonable.  Advocate appealed and a panel of the Eighth Circuit upheld the district court's determination.

Rehearing the case en banc, however, the Eighth Circuit reversed the district court and held that bifurcation was appropriate.  The Eighth Circuit held that § 506(b) applied a reasonableness standard to all contractually set attorneys' fees.  275 F.3d at 1314-15.  The court noted that the state statute at issue addressed the enforceability of contractually set attorneys' fees, a concept distinct from the reasonableness standard in § 506(b).  *Id*. at 1315.  Thus, § 506(b) added a layer of scrutiny to fee arrangements beyond state law requirements.  *Id*.  This conclusion – that all contractually set attorneys' fees owed to an oversecured creditor must be assessed for reasonableness – was in accord with the other circuit courts that considered the issue.  *Id*.

The court next examined the interplay between § 502 and § 506(b).  Under § 501, a claim, defined as a "right to payment," is "allowed" under the Bankruptcy Code unless a party in interest objects.  *Id*. at 1316.  Upon objection, the bankruptcy court should allow the claim unless an enumerated exception applies.  *Id*.  One of the exceptions at issue in *Welzel*, which is also the relevant one here, disallows claims "unenforceable against the debtor, under . . . applicable law." *Id*. n.5 (citing 11 U.S.C. § 502(b)(1)).  The court noted that this objection did not apply as the parties agreed that Advocate's claim to fees was enforceable under state law.

"Section 506(b) should be read against the backdrop of general instructions enunciated in §

11

502." *Id.* at 1317.  Because § 506 is silent on the allowance or disallowance of attorneys' fees, it "is meant not to displace the general instructions laid down in § 502, but to be read together with § 502 in a complimentary manner."  *Id.*  Section 506 deals with whether a claim is secured or not, a narrower issue than § 502, which focuses on whether a claim is allowed.  *Id.* at 1317; *see also In re Gencarelli*, 501 F.3d 1, 5 (1st Cir. 2007) ("There is universal agreement that . . . [§ 506] does not answer the materially different question of whether the claim itself should be allowed or disallowed.").  Whether the claim is allowable must be determined first.  *Welzel*, 275 F.3d at 1318; *see also Gencarelli*, 501 F.3d at 6, 8-9 (relying on *Welzel* and remanding case for determination of whether prepayment penalties were enforceable under state law and hence allowed under § 502).  Only if a claim is allowable does the issue of whether the allowed claim is secured and thus entitled to preferential treatment become relevant.  *Welzel*, 275 F.3d at 1318.  Because none of the exceptions applied, the Eighth Circuit concluded that Advocate's claim for attorneys' fees was allowed and a § 506(b) reasonableness analysis was necessary.  The court ordered that the attorneys' fees be bifurcated and those deemed reasonable be treated as secured claims and those deemed unreasonable be treated as unsecured claims.  *Id.* at 1320; *see also Gencarelli*, 501 F.3d at 5 (holding that any claim satisfying § 502 was allowable and hence "at the very worst, collectible as an unsecured claim").

Finally, the Eighth Circuit rejected Welzel's equitable argument that a bifurcated framework would give creditors a windfall by allowing them to collect attorneys' fees far in excess of the value of services actually provided.  The clear language of the Bankruptcy Code could not be overridden by generalized equitable arguments.  Additionally, the equities favored Advocate; because it was oversecured and Welzel was solvent, a disallowed claim benefitted Welzel, not his other creditors.

*Id*. at 1319.  The court also feared that if § 506(b) permitted disallowance of unreasonable fees, debtors would have an incentive to avoid their contractual obligations.  *Id*.  Finally, if § 506(b) was read as a disallowance provision, unsecured creditors would be favored over secured ones because they would have an allowed claim under § 502, while the oversecured creditors would have unreasonable fees disallowed under § 506(b).  *Id*.  The Bankruptcy Code did not intend such an absurd result.

Foster asserts that because he is oversecured, § 506(b) applies.  Furthermore, the issue of § 502 was not raised until after the hearing on Debtor's objection, so Foster complains that he had no opportunity to respond to the argument.  (Appellant's Br. at 11.)  Foster has put the cart before the horse.  He may have taken for granted that his claim would be analyzed under § 506(b), but the Bankruptcy Court was not bridled by Foster's take on the law.  Debtor filed an objection to Foster's proof of claim, which should have put Foster on notice that the Bankruptcy Court would examine the proper amount of the claim, necessarily determining whether it was allowed or not.

*Welzel* is distinguishable from the facts of this case.  In *Welzel*, it was undisputed that Advocate's claim for attorney's fees was enforceable under state law and thus Welzel was forced to argue that § 506(b) preempted state law and could operate to disallow the attorneys' fees.  *Welzel*, 275 F.3d at 1317 n.5.  But here, before the § 506(b) reasonableness question is reached, the question of whether the fees are permitted under the agreements and Pennsylvania law – and thus constitute part of an allowable claim under § 502(b)(1) – must be determined.  The *Welzel* framework is "only appropriate if the fees are otherwise allowed and enforceable."  *See In re Friedel*, 324 B.R. 138, 144 (Bankr. M.D. Ala. 2004).  If the claim cannot be enforced under the agreement or under state law, it is not allowable under § 502(b)(1).  *Id*.

The Note in *Welzel* stipulated that attorneys' fees would be 15% of principal plus accrued interest. In contrast, the agreements here are by their terms subject to Pennsylvania law but contain no formula for the calculation of fees. If the agreements or Pennsylvania law would forbid the recovery of the attorneys' fees here, or any portion thereof, they must be disallowed under § 502. Those attorneys' fees deemed allowable would then be subject to a § 506(b) analysis. Thus, in accordance with Pennsylvania law, the agreements here limit the recovery of attorneys' fees.

The question for purposes of the initial § 502 analysis is whether Pennsylvania law would permit Clever to collect unreasonable attorneys' fees. Unquestionably, Pennsylvania law permits the contractual fee-shifting of attorneys' fees. *W. Chester Realty*, 186 B.R. at 618. But also beyond dispute, Pennsylvania law requires that attorneys' fees awarded as part of a contractual fee-shifting provision be reasonable. *In re Gordon-Brown*, 340 B.R. 751, 755 n.6 (Bankr. E.D. Pa. 2006) ("It has long been the law in Pennsylvania that a contractual attorneys' fee-shifting provision is enforceable only to compensate a plaintiff for the reasonable and necessary expense of collection."); *W. Chester Realty*, 186 B.R. at 618. Such a fee-shifting agreement is not enforceable "to the extent it would result in an award in excess of a reasonable rate." *In re Gordon-Brown*, 340 B.R. at 755 n. 6 (citing *Jarvis v. Stoffal*, 54 Pa. Super. Ct. 362 (1913)). A court will read this reasonableness requirement into a contract with an attorneys' fees provision that lacks an explicit directive that such fees be reasonable. *McMullen v. Kutz*, 925 A.2d 832, 834-35 (Pa. Super. Ct. 2007) (relying on *Duffy v. Gerst* 429 A.2d 645 (1981). This reasonableness requirement meshes with Pennsylvania's Rules of Professional Conduct which make it unethical for an attorney to enter into an agreement for, charge, or collect a clearly excessive fee. PA. R. PROF'L CONDUCT R. 1.5(a).

Enforcing the agreements as Clever suggests would award him unreasonable attorneys' fees,

rendering the provision invalid under state law. Disallowing fees deemed excessive, however, leaves Foster in precisely the position he contracted for – Clever may receive reasonable attorneys' fees and nothing more. Furthermore, under the terms of the Mortgage, Foster agreed that any attorneys' fees were subject to a reasonableness assessment under Pennsylvania law. The Mortgage states that the lender may only collect those attorneys' fees "the court may adjudge reasonable." Appellant's argument highlights the danger of unchecked attorneys' fees and the necessity of reading into contracts a reasonableness provision, as well as applying such provisions. If both reasonable and unreasonable attorneys' fees will be paid in full, as secured and unsecured claims, respectively, attorneys have an incentive to bill with reckless abandon, unfettered by any check on what is reasonable. Indeed, if § 506(b) applied here without regard to § 502, the requirement that fees incurred under § 506(b) be reasonable would be meaningless because Appellant's lawyers would receive all fees incurred – reasonable or not. Such a reading of the law is an invitation to abuse. *See In re Reorganized Lake Diamond Assocs.*, 367 B.R. 858, 867 (M.D. Fla. 2007) (noting that § 506(b) was not "a blank check for oversecureds to accrue legal fees beyond the scope of protecting their interest" and therefore disallowing claims fees under § 502, which would not be permitted under state law).

Having determined that the Bankruptcy Judge properly framed the legal issue regarding attorneys' fees, this Court must now determine whether the judge abused her discretion in reviewing Clever's requested fees. *See Ryker v. Current*, 338 B.R. 642, 651 (D.N.J. 2006), *affirmed*, App. A. No. 06-1872, 2007 WL 2138590 (3d Cir. July 26, 2007); *see also Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 258 (3d Cir. 1995) (abuse of discretion can occur if improper legal standard applied or award based upon clearly erroneous findings of fact). Her factual findings will be not be

15

overturned unless clearly erroneous.  *See* Fed. R. Bankr. P. 8013.

As noted earlier, only the fees of Attorney Ronald Clever are before this Court.  The judge began her analysis by noting that she "had numerous occasions to observe Clever's participation as he routinely appeared at the continued confirmation and dismissal hearings." *Foster*, 400 B.R. at 38.  She continued that her extensive experience presiding over Chapter 13 cases has enabled her to develop a "clear sense . . . of what is and what is not necessary to move a case toward its ultimate goal: confirmation and payment of creditors." *Id*.  Furthermore, the issue of payment to Foster was a matter of when, not if.  *Id*. at 38-39.

The Bankruptcy Court determined that Clever's legal strategy made the ultimate goal of plan confirmation difficult.  Clever needlessly protracted the matter by frequently objecting and urging dismissal of the bankruptcy case, rather than working with the Debtor toward a resolution.  *Id*. at 39. "Clever's approach and the attendant cost in hours he billed was in and of itself unreasonable." *Id*. Moreover, "[Clever's] lack of knowledge about the bankruptcy process precluded focused and meaningful objections lodged at the appropriate time." *Id*.  The Bankruptcy Court also questioned the credibility of Clever's billing due to his "failure to acknowledge contemporaneous timekeeping and to seek payment from his client." *Id*.

The Bankruptcy Court used the lodestar method to examine Clever's fees.  The judge first cut his hourly rate from $275 to $200, because he lacked bankruptcy experience and provided no evidence of his actual rate or what he intended to charge Foster.[4]  The Bankruptcy Court proceeded to conduct a thorough analysis of Clever's bills and cut hours deemed duplicative or unnecessary.

---

[4] The $200 an hour awarded was still greater than that of Kranson, "the seasoned bankruptcy attorney." *Id*. at 39.

The Bankruptcy Court expressed concern that Clever's entries were in a minimum of half-hour increments, "suggesting a rounding that undermines the reliability of the entry as it relates to actual time spent." *Id*. at 40. Furthermore, Clever's invoice was dated September 2, 2008, and contained entries from September 2007 through September 2008. (R. at Ex. 12.)

This Court will not revisit the calculations of the Bankruptcy Court. Factual determinations regarding the reasonableness of time spent on a bankruptcy case are best left to the judge who listened to testimony on the matter. Contrary to Clever's repeated protests, this Court's review of the record convinces it that the Bankruptcy Court made appropriate reductions. For example, Clever charged more to review, research issues and make changes to a three-page document containing no citation to legal authority, than Kranson did to prepare, file and serve that same three-page document. *Id*. at 40. He also charged more time than Kranson to perform the same tasks. *Id*. at 41. The Bankruptcy Court also cut Clever's requested fees to transition to a new bankruptcy lawyer. *Id*. at 43. Such a cut was reasonable; Debtor need not pay for Foster to play musical lawyers. The Bankruptcy Court also refused to award fees for vague descriptions. Likewise, this Court will not reward imprecision. The Bankruptcy Court further cut Clever's fees for attendance at hearings, a reasonable excise when his presence at those hearings was not necessary, and for exaggerated time estimates. *Id*. at 41-43. For example, Clever addressed the Bankruptcy Court at various hearings, "primarily to register his client's extreme displeasure at the deferral of payment occasioned by Debtor's resort to bankruptcy." *Foster*, 400 B.R. at 32. Additionally, Clever charged six hours for attending a hearing that "took a matter of minutes." *Id*. at 42. He also charged ten hours for a stay motion that lasted less than two hours and, although Clever was present in the courtroom, was handled by Kranson. *Id*. at 41. Spectators are not paid for their mere presence.

17

A large chunk of Foster's brief is dedicated to Clever attempting to justify his time spent on the matter. Clever pleads that Foster insisted that his rights as an oversecured creditor had to be protected and therefore Clever "always investigated the full range of options available to the secured creditor (instead of merely taking the easy route, as the judge's Opinion retroactively mandated)." (Appellant's Br. at 5.) This is an easy statement to make given that Foster was presumably not going to be paying Clever's fees. Clever asserts that he could leave no bankruptcy stone unturned as he shielded Foster from the cruel world set out to keep Foster from getting paid. But the reality of the situation is that Clever's client was never in danger of having his pockets dangling empty. Despite representations to the contrary, the Bankruptcy Court at no time suggested that Foster go unrepresented, that Foster "take the risk of things happening in his absence," or that Foster "surrender any of his legal rights." (Appellant's Br. at 5-6, 15-16.) None of this parade of horribles happened or was even threatened. As best as this Court can discern, Foster was well taken care of. Although the matters were addressed by other attorneys, Clever was free to attend every hearing, review every document, and research every issue. He is not free, however, to undertake those activities on the Debtor's dime and then expect to be paid as part of an unsecured claim. A lawyer's actions on behalf of his client are dependant upon the attendant circumstances. A belt and suspenders approach is to be applauded. But Clever seeks fees for having emptied out the closets and tried on every stitch of clothing he could find. The Bankruptcy Court determined much of Clever's work was duplicative, unnecessary, and/or counterproductive. This Court finds no error in that determination.

Repeatedly, Clever chides the Bankruptcy Court for cutting his fees "with no evidence." (Appellant's Br. at 18-19.) The Bankruptcy Court had the bills of all attorneys employed by Foster

throughout the case.  She also conducted a hearing, during which Clever offered testimony about his billing practices and his involvement in the case.  She was familiar with the case and the lawyers who worked on the matter before her.  The judge explicitly stated how many hours she was cutting and the reason for the reductions, whether it was the duplicative nature of the work, its lack of usefulness, or the vague description provided.  A lack of evidence is far different from a disagreement with an interpretation of the evidence, which is what Clever has presented in Appellant's brief.

Clever's arguments in support of the time he expended on this matter are filled with hyperbole and indignant shock at the actions of the Bankruptcy Court.  For example, he complains that "many, many, many" of the Bankruptcy Judge's decisions are "completely *unsupported*"or "patently wrong" or "absurd," or the record contains "no evidence to support the judge's 'imagin[ings]."  (Appellant's Br. at 23.)  But, as Clever understands the law, he bills and the bankruptcy judge, with pen at the ready, signs the order approving his bills unless expert testimony is offered to challenge his bill.  (*Id*. at 13, 22.)  This judge-as-rubber-stamp view of a request for attorneys' fees is "completely *unsupported*."

Having determined that the Bankruptcy Court properly disallowed a portion of Clever's requests for fees, this Court finds that the allowed claim for the remainder is reasonable under § 506(b) and is thus a secured claim.

### C.    Interest

Foster takes exception to the Bankruptcy Court's decision to toll the running of interest while the parties briefed several legal issues and claims that the Bankruptcy Court's decision to terminate the accrual of interest from September 11, 2008, the date of the hearing on Debtor's objection to

Foster's claim, was erroneous.

Kaliner, Foster's counsel, requested forty-five days to file a brief and counsel for Debtor requested two weeks to respond. The Bankruptcy Court, in part because Foster's counsel's secretary was gravely ill, extended Kaliner the courtesy and granted him forty-five days, rather than two weeks, to file his brief. However, the judge recognized that it was unfair to Debtor to give Kaliner an extra month of time while the interest continued to run. Thus, she expected "an accommodation for him on interest." (Bankr. Hrg. Tr. at 116.) Furthermore, the Bankruptcy Court tolled the running of interest for an additional three weeks because counsel for Debtor extended a professional courtesy to Kaliner and agreed to continue the hearing because Kaliner had recently been appointed counsel. (*Id*.) She therefore tolled the running of interest "seven weeks credit post petition." (*Id*. at 117.) Apparently, the judge believed that Clever's facial expressions revealed dismay at her decision, as she stated, "Don't look so stunned, Mr. Clever. It's the fair thing to do." (*Id*. at 116.) Clever replied that he "didn't mean to look stunned. It's just – I'm just listening." (*Id*.) In her opinion, she reiterates that "interest stopped accruing on September 11, 2008, the date of the hearing on the Objection, during the briefing schedule agreed to by the parties." *Foster*, 400 B.R. at 36.

On December 18, 2008, the Bankruptcy Court ordered the Trustee to pay Foster the uncontested judgment amount ($247,067.26) to "ensure no further claim for interest accrual could be made." *Foster*, 400 B.R. at 33. However, Appellee correctly notes that the December 23, 2008 Order, from which Foster appealed, makes no reference to a suspension of interest but instead contains a guideline for the parties to calculate the interest owed. Appellee thus contends that the issue of suspension of interest is not before this Court. However, it is clear that at the time the Bankruptcy Court issued its opinion, interest was no longer accruing. *Foster*, 400 B.R. at 36, 44

n.13. Given the lack of clarity from the record, as well as the clear directive from the Bankruptcy Court that Debtor was entitled to a suspension of interest, the Court will address the issue.

The Bankruptcy Court found that the parties had reached an agreement to toll the running of interest for a period of seven weeks: "The parties agreed to a rather protracted briefing schedule. To accommodate the briefing schedule requested by Foster, his counsel agreed that to the extent that post-judgment interest is allowable, seven weeks of interest will be credited to Debtor." *Id*. at 33. The record, to which the Bankruptcy Court cited, contains ample support for this contention. The judge adjourned court without so much as a peep regarding her decision to toll the running of interest – indeed, Clever himself sat silently as the Bankruptcy Judge brokered the agreement. He may not now back out on the deal.

The Bankruptcy Court determined that, apart from the seven week tolling of interest, "interest shall not resume on the judgment amount as Debtor has tendered an offer to pay which was not accepted." *Id*. at 36. This conclusion further cut off interest after the September 11, 2008 hearing, although a final plan had not been confirmed. In an order issued shortly before her decision regarding Debtor's objection to Foster's claim, the Bankruptcy Court ordered that the Trustee make an initial distribution of $247,067.26, the undisputed judgment amount. This was done after the Bankruptcy Court raised the issue of distributing the proceeds of the sale and, despite Debtor's suggestion that the proceeds up to the judgment amount be paid to Foster to stop the running of interest, Foster refused. The Bankruptcy Judge found Foster's refusal, as conveyed by Clever, curious given his complaints about the delay his client suffered attendant to the Chapter 13 case.

Foster takes issue with the decision to stop the running of interest due to his failure to settle the matter. He claims that "there is not (and there can never be) a factual record of any settlement

offer that was on the table" because evidence of a settlement is not admissible into evidence. (Appellant's Br. at 26.)  He also contends that the Creditor was not legally required to accept a settlement.  (*Id.*)  Appellee counters that given the context of the case – of which the Bankruptcy Court was well aware – Foster's refusal to be paid the undisputed amount of the judgment served only to permit his claim for interest to continue to accrue.  (Appellee's Br. at 17-18.)

The Court finds no error in the Bankruptcy Court's decision.  Appellant's argument that no factual record of a settlement *can* exist does not square with the Rules of Evidence.  Rule 9017 of the Federal Rules of Bankruptcy Procedure makes the Federal Rules of Evidence applicable to cases brought under the Bankruptcy Code.  Presumably, Appellant is relying on Federal Rule of Evidence 408, which makes settlements and offers of settlement inadmissible under certain circumstances. Specifically, settlement negotiations are not admissible "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount."  FED. R. EVID. 408(a). However, Rule 408 "does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)."  FED. R. EVID. 408(b).  To the extent the Bankruptcy Court used the prospect of settlement in its decision to stop the running of interest, it did not do so to prove liability or call into question the validity or amount of a claim.  The amount of the claim (the Judgment) itself was undisputed.  Rather, the Court considered the issue of settlement in the context of Foster's purposeful delay of the proceedings.  Given the history of the case and the circumstances surrounding Foster's conduct regarding his claim, the Bankruptcy Court intervened to ensure that Foster's claim did not continue to accrue interest due to his delay in receiving payment.  That does not run afoul of Rule 408.  Furthermore, it was the Bankruptcy Court that raised the issue of Debtor's offer – no party sought to introduce any offers or negotiations into evidence.  Rule 408 is not

applicable here.

Although § 506(b) states that an oversecured creditor "shall be allowed . . . interest on such claim," Foster's right to interest on his claim is not in question.  But that right remains subject to equitable defenses.  *See Solomon v. Wein*, 145 B.R. 872, 878 (W.D. Mich. 1992); *see also In re Lapiana*, 909 F.2d 221, 224 (7th Cir. 1990).  Granted, § 506(b) does not provide a blank check to a bankruptcy court judge to ignore the law in the name of equity.  "Creditors have rights, among them the right of oversecured creditors to post-petition interest, and bankruptcy judges are not empowered to dissolve rights in the name of equity." *Lapiana*, 909 F.2d at 224.  Based on the facts, the Bankruptcy Court determined that Foster could have been paid sooner but for his failure to accept payment in the amount of the judgment.  Thus, any delay is attributable to Foster and it would be unjust to force Debtor to pay for Foster's decision.  So, while Foster was free to refuse the offer, he could not continue to run up the tab.  The Bankruptcy Court did not ignore the Bankruptcy Code on the subject of interest and this Court will not disturb its decision.


**IV.    CONCLUSION**

Upon review of the record and the parties' filings in this matter, the Court finds no error in the Bankruptcy Court's decision.  Accordingly, the decision of the Bankruptcy Court is affirmed.  An appropriate Order will be docketed.